UNITED STATES of America, Appellee,

v.

Luis CARBONE, a/k/a "Luiggi,"
Defendant, Appellant.

No. 85–1685.

United States Court of Appeals,
First Circuit.

Argued June 4, 1986.

Decided Aug. 13, 1986.

---

Nathan Z. Dershowitz and Alan M. Dershowitz, argued, with whom Victoria B. Eiger and Dershowitz & Eiger, P.C. were on brief, for defendant, appellant.

Jorge E. Vega Pacheco, Asst. U.S. Atty., with whom Jose A. Quiles, Acting U.S. Atty., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Appellant-defendant Luis Carbone was convicted by a jury on all three counts of an indictment charging: conspiracy with intent to distribute cocaine in violation of 21 U.S.C. § 846; aiding and abetting in the possession of half a kilogram of cocaine with intent to distribute it; and aiding and abetting in the distribution of half a kilogram of cocaine. The second and third counts allege violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Defendant raises three issues on appeal: the admission into evidence of tape recordings and the use of transcripts of the recordings; whether the evidence was sufficient to prove a conspiracy with intent to distribute; and whether the district court should have conducted a post-trial *in camera* hearing to determine whether a government witness had committed perjury during the trial.

## I. THE ADMISSION OF THE TAPE RECORDINGS AND THE USE OF TRANSCRIPTS

### A. *The Tape Recordings*

■ Defendant challenges the admission of the tape recordings on the grounds that none of them were authenticated properly, that some of them were inaudible, and that one was inadmissible because it was "enhanced." The contours of the law governing the admissibility of tape recordings are well defined. The government has the duty of laying a foundation that the tape recordings accurately reproduce the conversations that took place, *i.e.*, that they are accurate, authentic, and trustworthy. Once this is done, the party challenging the recordings bears the burden of showing that they are inaccurate. *United States v. Rengifo*, 789 F.2d 975, 978–79 (1st Cir. 1986). "The decision to admit [tape recordings] into evidence is reversible only if the district court abused its discretion." *United States v. Cortellesso*, 663 F.2d 361, 364 (1st Cir.1981). *See also United States v. Slade*, 627 F.2d 293, 301 (D.C.Cir.1980); *United States v. Richman*, 600 F.2d 286, 294 (1st Cir.1979); *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir.1977).

This circuit has long followed the generally accepted rule that where a tape recording is challenged on the grounds of audibility the question is whether "the inaudible parts are so substantial as to make the rest more misleading than helpful" and that admissibility rests within the discretion of the trial judge. *Gorin v. United States*, 313 F.2d 641, 651 (1st Cir.1963); *United States v. Nashawaty*, 571 F.2d 71, 75 (1st Cir.1978). *See also United States v. Robinson*, 707 F.2d 872, 876 (6th Cir.1983); *United States v. Sutherland*, 656 F.2d 1181, 1200 (5th Cir.1981); *United States v. Bell*, 651 F.2d 1255, 1259 (8th Cir.1981); *United States v. Slade*, 627 F.2d at 301; *United States v. Llinas*, 603 F.2d 506, 508 (5th Cir.1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.1967); 1 Weinstein's Evidence, J.

Weinstein & M. Berger, § 106[01] at 106–10–11 (May, 1986).

■ We have upheld the use of composite tapes as evidence. *United States v. DiMuro*, 540 F.2d 503, 512 (1st Cir.), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1976). As long as the tape recording is properly authenticated, we see no reason why a recording that has been enhanced to improve its audibility by filtering out background noises and improving the clarity of the voices should not also be allowed in evidence. *See Fountain v. United States*, 384 F.2d 624, 631 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *United States v. Knohl*, 379 F.2d at 440.

With these legal principles as a background, we now turn to the trial proceedings. Defendant was furnished with copies of the tape recordings to be offered in evidence in enough time prior to the start of the trial so that he could listen to them and prepare a list of objections to their use, which he did. The objections were not made, however, until after the trial started. Defendant's motion that the trial judge listen to the tapes outside of the presence of the jury before ruling on their admissibility was denied. The stated reason was that defendant should have requested a pretrial hearing on the admissibility of the recordings. Defendant's appellate counsel now argues that the judge who handled the pretrial proceedings, a different judge than the trial judge, told defendant's trial counsel that he would not rule on evidentiary challenges until the challenged evidence was offered at trial. Our examination of the record has revealed no such ruling, nor could we find a motion by defendant asking for a pretrial hearing and ruling on the admissibility of the tape recordings. We also note that, although the trial judge verbally chastised defense counsel more than once for not asking for a pretrial ruling on the admissibility of the recordings and related transcripts, counsel did not assert that such an attempt had been made and rejected.

■ The preferred way of handling challenges to the accuracy and audibility of tape recordings is at a pretrial hearing. If this is not possible, we see no reason why the district court must lengthen a trial by listening to the tapes outside the presence of the jury. Some tape recording playbacks run for a considerable period of time. If the recordings are properly authenticated, the trial judge can listen to them as they are played to the jury and rule on objections when made. This is the manner in which most testimony is presented. It is within the district court's discretion to determine how evidentiary challenges shall be met. The basic question is whether the tapes were properly admitted into evidence. We find that they were.

■ Before the tape recordings were admitted into evidence, Edwin Hernandez, the DEA agent in charge of the investigation, explained how each recording was made. There were two types of recordings used: a body recorder, called a Nagra, used by an undercover agent to record conversations uttered at meetings; and tape recordings of telephone conversations. Herndandez described in detail how the body recorder worked and how the conversations were recorded. An expert witness, Robert Brady, also testified as to the operation of the tape recorders. The voices on each of the recordings were identified by a person present during the meeting or privy to the telephone conversation. All the conversations were in Spanish but before the tapes were played the trial judge ascertained that Spanish was the native language of all the jurors. Appellant has suggested that since the conversants used Puerto Rico "street" language the jurors would have had difficulty understanding what was said. This overlooks the fact that the jurors were natives of Puerto Rico and its street language is not foreign to them. We find that the authentication process was satisfactory.

■ We have played all of the tapes and find that none of them were so inaudible or unintelligible as to make them more misleading than helpful. It is true that exhibit 15, the tape of the visit of government informant Rivera (Manny on the tape) to defendant's office on September 19, 1984, had large gaps due to inaudibility caused by the overlay of background noises. This tape, however, was filtered and then enhanced into a new tape, exhibit 19, which was clear and understandable. The judge explained to the jury that exhibits 15 and 19 were recordings of the same conversations and had them both played.

■ Defendant objects to the admission of exhibits 15 and 19 because of the enhancement. There is no basis for finding as a matter of law that the enhancement process rendered exhibits 15 and 19 inaccurate and untrustworthy. Robert Brady, a self-employed electrical engineer specializing in developing surveillance equipment for law enforcement agencies, testified for the government. He explained the filtration and enhancement process; it was his opinion that neither process altered or distorted the words recorded. Defendant's expert, Frank M. McDermott, gave a detailed critique of the tape recordings; it was his opinion that they were not accurate. The credibility of the expert witnesses was properly left to the jury.

### B. *The Use of Transcripts*

The trial judge permitted the jury to use transcripts to follow each recording as it was played. Each transcript had two columns: the left-hand column, entitled "Transcript," was in Spanish; the right-hand column, entitled "Translation," was in English. Copies of the transcripts had been furnished defendant prior to trial along with the tape recordings so he had ample opportunity to check their accuracy. When the government first offered a transcript for use by the jury, defendant objected to the admissibility of all the transcripts on two grounds: lack of proper authentication, and inaccuracies in both the Spanish transcripts and the English translations. Defendant requested that the judge check the transcripts against the tape for accuracy before allowing the jury to use them. The judge ruled that the transcripts would

not be admitted in evidence, that the jury would be instructed that the tapes, not the transcripts, were evidence and that any differences between the two must be resolved in favor of what was heard on the recording. The motion that the judge check the transcripts against the tapes for accuracy outside the presence of the jury was denied but defense counsel was told that she could point out any inaccuracies in the transcripts "as we go along." Our reading of the record reveals that no specific inaccuracies in any of the transcripts were pointed out or made the basis of an objection as they were used during the trial. Evidently, defense counsel relied on her general objection to the use of the transcripts. The record shows that each time a transcript was furnished the jurors the judge carefully instructed them in accord with his ruling and that the transcripts were taken from the jurors as soon as the playback of each recording was finished.

■ The trial judge's handling of the transcripts was in accord with the law in this circuit. We have approved, as have most circuits, the use of transcripts as a jury aid in following tape recording playbacks. *United States v. Rengifo*, 789 F.2d at 980; *United States v. Fontanez*, 628 F.2d 687, 691 (1st Cir.1980); *United States v. DiMuro*, 540 F.2d at 512. The trial judge's instructions that the tapes, not the transcripts, constituted the evidence and that the tapes controlled if there was any difference between them reflected accurately the rule in this circuit. *United States v. Richman*, 600 F.2d at 295; *United States v. Nashawaty*, 571 F.2d at 75.

■ The question of whether the trial judge was obligated to check the transcripts against the tapes prior to their use by the jury was addressed by us in the very recent case of *United States v. Mazza*, 792 F.2d 1210 (1st Cir.1986). In that case, we rejected the suggestion that we create an absolute rule requiring district judges to review transcripts whenever the parties do not stipulate to their accuracy. At 1226. We followed the reasoning of the Fourth and D.C. Circuits and ruled that it was not an abuse of discretion for a trial judge to refuse to review transcripts *in camera* on the basis of general objections. At 1226. *See United States v. Collazo*, 732 F.2d 1200, 1203 (4th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); *United States v. Slade*, 627 F.2d at 302–03.

■ Nor do we find any merit in defendant's objection to the translations. No specific objections were made during the course of the trial to the English translation transcripts, nor have any specific mistakes been pointed out to us, for whose benefit we assume the translations were made. The case was tried by a bilingual jury whose native tongue was Spanish. We can see no error in the use of the transcript translations.

The question of transcript authentication is, however, torublesome. The government claims that the transcripts were properly authenticated because all of them were signed and certified as true transcripts and translations by court interpreters certified by the Administrative Office.[1] But aside from the testimony of Robert Brady relative to the tapes that he filtered and enhanced,[2] there was no testimony by anyone as to how the transcripts were made.

■ We think that when transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence, *i.e.*, by testimony as to how they were prepared, the sources used, and the qualifications of the person who prepared them. *See Rengifo*, 789 F.2d at 983; *United States v. Robinson*, 707 F.2d at 878–79. Even if transcripts are not admitted in evidence, in the sense of being

---

**1.** This is not entirely accurate. The transcript that went with exhibit 15 was not signed by anyone; the judge, however, did not allow the jury to use it.

**2.** Although the record is not entirely clear, it would appear that Brady filtered four tapes and enhanced only one, exhibit 15.

marked as exhibits, they are read and relied on by the jury to follow the playback. They should, therefore, be as accurate as possible, which can only be determined if they are authenticated. Authentication does not impose an undue burden either on the government or on a defendant submitting alternate transcripts.

Under the circumstance of this case, however, it was not an abuse of discretion for the trial judge to allow the jury to use the transcripts. Defendant had the transcripts and corresponding tape recordings sufficiently long before the trial to make what he considered to be accurate transcriptions. This was not done. And, although invited to do so by the judge, defendant made no specific accuracy objections prior to the use of each transcript. To paraphrase what we said in regard to tapes in *United States v. Cortellesso*, 663 F.2d at 364, transcripts are not to be rejected because of hypothetical possibilities of inaccuracies.

## II. SINGLE TRANSACTION OR CONSPIRACY WITH INTENT TO DISTRIBUTE

We review the evidence with all legitimate inferences to be drawn therefrom in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 81, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942); *United States v. Quejada-Zurique*, 708 F.2d 857, 859 (1st Cir.), *cert. denied*, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983); *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir.1978).

Viewed in this light, the government proved the following facts. At the request of defendant, Junior Mejias prevailed upon Nicolas Burgos Colon, a highly successful drug dealer, to meet with defendant at Mejias' house to discuss the sale of cocaine to defendant. At the time of the meeting, defendant was accompanied by one Flaco Souclat. Defendant agreed to pay Burgos Colon $16,000 for half a kilo of cocaine. Defendant explained that he did not have

the money at that time to pay for the cocaine, but assured Burgos that he would be responsible for payment. It was agreed that defendant would have a month to make payment because a month gave him enough time to sell the cocaine and raise the money. It was understood that Souclat would do the actual selling. After the arrangements were made, Burgos went to his girl friend's house and returned with the cocaine. Souclat examined it, said it was good and, because it was in crystal form, not powder, did not have to be tested. The defendant and Souclat left with half kilo of cocaine. Defendant did not pay for the cocaine within one month and most of the tape recordings are of meetings and telephone calls between Mejias, Burgos, and government informants discussing ways of getting defendant to pay for the cocaine. There are recorded conversations of a meeting at defendant's law office on September 19, 1984, at which Mejias, informant Rivera and defendant were present. The subject of the conversation was the payment of the balance due on the half kilo of cocaine. A subsequent meeting on September 25 between Rivera and defendant was devoted to the same subject.

These facts are sufficient to prove a conspiracy between defendant, Burgos, Mejias, and Souclat to possess with intent to distribute half a kilo of cocaine.[3] If the sale had not been made on credit, a credible argument might be made that it was a single transaction. But all of the parties understood that in order for the price of $16,000 to be paid, the defendant would have to sell the cocaine, presumably for more than the sales price. This was not a single sale; it was a sale for further distribution. All of the persons involved understood this and conspired together to effect the distribution through the defendant, whose sales agent was Souclat. The conspiracy began when the cocaine was sold on credit and continued until final payment was made.

---

**3.** Burgos, Mejias and Souclat were indicted along with defendant on the same charges.

### III. WHETHER THERE SHOULD HAVE BEEN A POST–TRIAL HEARING ON ALLEGED PERJURY BY A GOVERNMENT WITNESS

■■■■ Burgos Colon, the drug dealer, who sold the half kilo of cocaine to defendant testified at the trial as a government witness. His testimony tracked in all material aspects the recorded conversations between himself, Mejias and the two government informants who were present at the tape recorded meetings.[4] Burgos testified in effect that he had sold the cocaine to defendant on credit and that defendant did not pay for it as promised. He detailed his efforts to collect the balance due from defendant using, unknown to him, the two informants as collectors.

The material allegations of defendant's motion for a post-trial hearing are: that the testimony of Burgos was false; that Oscar Padro Boneta, an inmate at the Commonwealth Penitentiary at Rio Piedras, agreed to submit an affidavit, stating that Burgos told Padro that he had never entered into a drug transaction with defendant;[5] that the conversation between Padro and Burgos took place when they shared the same cell in December, 1984; that defendant did not learn of the conversation and Padro's identity until after his conviction.

Because it is the core of defendant's argument on appeal, we quote the penultimate paragraph in full.

10. Defendant requests that attorney Carlos Noriega, Mr. Burgos' former attorney, be permitted the opportunity to present to the Court, on the record, but in camera, evidence which supports Mr. Padro's affidavit. Mr. Carbone requests that the evidence be presented in camera, as opposed to being presented in open Court because it requires the Court to first determine whether the evidence violates the attorney-client privilege prior to its being disclosed. For that reason, the defendant respectfully requests that the Court review first, an offer of proof and that it then make a determination as to whether this type of evidence violates the attorney-client privilege and that it further find whether the offer of proof requires ordering Mr. Noriega to disclose the evidence. In order to preserve the integrity of the attorney-client relationship between Mr. Noriega and his former client, Mr. Burgos, the defendant, therefore, requests that this disclosure take place in camera.

No offer of proof was filed with the motion and there is none in the record on appeal. Nor is there any statement by Attorney Noriega or a request by him to disclose evidence to the court in camera.

The trial judge acted well within his discretion in refusing to grant a hearing on this motion. What the motion seeks is that the judge inspect evidence in camera on defendant's assertion, through counsel, that it will support the Padro affidavit. The judge is then to determine whether the evidence will violate the attorney-client privilege between Attorney Noriega and Burgos and if it is determined that it will not, then the court is asked to order Noriega to disclose the evidence. Absent any kind of a statement from Noriega or a specific offer of proof, there was no basis for a hearing on the motion.

The Supreme Court has declared unequivocally that the attorney-client privilege does not cover the commission of perjury.

An attorney's duty of confidentiality, which totally covers the client's admission of guilt, does not extend to a client's announced plans to engage in future criminal conduct. See Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). In short, the responsibility of an ethical lawyer, as an

---

**4.** There were three recorded meetings with Burgos at which one of the informants was present with a body recorder: meeting at Las Vegas Minimarket, Villalba, P.R., on August 30, 1984; meeting at Burgos' house on September 5, 1984; and meeting with Burgos at Coamo, P.R., on September 20, 1984.

**5.** An affidavit written in Spanish and signed by Padro is now attached to the motion.

officer of the court and a key component of a system of justice, dedicated to a search for truth, is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury. No system of justice worthy of the name can tolerate a lesser standard.

*Nix v. Whiteside,* — U.S. —, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986). Burgos was one of the indicted defendants in this case. Noriega represented him through his plea of guilty. It must be assumed that when Burgos pled guilty Noriega knew he was going to testify as a government witness. If Noriega knew that Burgos had committed perjury when he testified, Noriega, as an officer of the court, had a duty to inform the judge immediately. *McKissick v. United States,* 379 F.2d 754, 761 (5th Cir.1967). Canon 7 of The Puerto Rico Canons of Professional Ethics imposes a positive duty of disclosure on an attorney in such a situation:

> It shall be highly improper of a lawyer to offer legal advice to a person or entity to facilitate or conceal the commission of a public offense. If a lawyer is informed by his client of the latter's intention to commit a public offense, the former has the duty to adopt the necessary measures to prevent the commission of the offense.

Puerto Rico Laws Ann. tit. 4 App. IX at 553. Noriega's duty was clear. If Burgos committed perjury and Noriega knew it, no advisory opinion from the court on whether disclosure would violate the attorney-client privilege was required.

Moreover, our review of the evidence indicates it was highly unlikely that Burgos' testimony was false. If Burgos committed perjury, then the recorded conversations of the other indicted defendants, Mejias and Souclat, had to be not only false, but part of a deliberate and calculated scheme. This borders on the incredible.[6]

Contrary to what defendant argues, Burgos was not the key witness for the government, defendant was. In his taped conversations, defendant acknowledged buying the cocaine and not paying for it as promised. He blamed the failure to pay on Souclat, but assured Burgos' collector, informant Rivera, that he was making arrangements to pay the balance due by selling some property (conversation of September 19) and that he had an option on the sale of his condominium (conversation of September 25). The evidence against defendant was overwhelming; he was convicted by the words out of his own mouth.

We, therefore, find that the district court did not abuse its discretion in denying a post-trial hearing on defendant's motion. This, of course, does not preclude the defendant from bringing a new motion in the district court accompanied by a statement from Noriega that he is willing to testify and an offer of proof covering the subject matter of his testimony.

It follows that defendant's motion for a new trial on the same grounds was properly denied.

*Affirmed.*

---

6. Three telephone conversations between Mejias and an informant were recorded. Mejias was also present at most of the recorded meetings. There was a recorded meeting between Souclat and an informant on October 23, 1984. All of the recorded conversations centered on the defendant's failure to pay for the half kilo of cocaine purchased from Burgos.