912 F.2d 1536
 UNITED STATES of America, Appellee,
v.
Esnoel LOPEZ-PENA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Hector BURGOS, a/k/a Tito, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Elvin PEREZ-SOTO and Fernando Rupert-Gonzalez, Defendants,
Appellants.
UNITED STATES of America, Appellee,
v.
Santos Jesus MARTINEZ-TORRES, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Luis Alfredo MARTINEZ-TORRES, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Epifanio MARTINEZ-TORRES, a/k/a Fanny, Defendant, Appellant.
 Nos. 87-2003 through 87-2008.
 United States Court of Appeals,
First Circuit.
 Heard May 5, 1989.
Decided Nov. 22, 1989.
 
 Pia Gallegos, New York City, with whom Harry Anduze Montano, was on brief, for appellants Santos Jesus Martinez-Torres, Luis Alfredo Martinez-Torres and Epifanio Martinez-Torres.
 Maria H. Sandoval with whom Law Offices of Nachman & Fernandez-Sein, Santurce, P.R., was on brief, for appellants Esnoel Lopez-Pena and Hector Burgos.
 Luis R. Rivera, Old San Juan, P.R., with whom Marco Antonio Rigau, San Juan, P.R., was on brief for appellants Elvin Perez-Soto and Fernando Rupert-Gonzalez.
 Jorge E. Vega-Pacheco, Asst. U.S. Atty., San Juan, P.R., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief, for the U.S.
 Before SELYA and ALDRICH, Circuit Judges, and RE,* Judge.
 BAILEY ALDRICH, Senior Circuit Judge.
 
 
 1
 Between December 11, 1985, and January 31, 1986, Alvin G. Aponte-Marrero (Aponte), an undercover agent for the Bureau of Special Investigations of the Puerto Rico Justice Department, assisted by an informant, made five purchases of heroin in Santa Isabel, Puerto Rico. A hidden tape recorder recorded each of these transactions, and these tapes, along with the agent's testimony, were the primary evidence at the trial of the seven appellants. All seven were found guilty of conspiracy to distribute heroin. Epifanio Martinez-Torres (as some other defendants have the same family name, we will use the given one: Epifanio), was also found guilty of five counts of possession with intent to distribute and four counts of distribution. Hector Burgos was also found guilty of three counts of possession with intent to distribute, and Elvin Perez-Soto was also found guilty of two counts of possession with intent to distribute, and each of these three was also found guilty of two counts of distribution. These defendants do not contest the sufficiency of the evidence to convict them as conspirators, but the other four do. We will start with the one whose claim in this respect is the strongest.
 
 
 2
 Our previous opinions on this subject, see, e.g., United States v. Rivera-Santiago, 872 F.2d 1073, 1078-79 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); United States v. DeLutis, 722 F.2d 902, 905-07 (1st Cir.1983), adequately set forth the method of analysis in evaluating such claims and we need not repave that road. Suffice it to say that the government must present clear evidence sufficient to establish beyond a reasonable doubt that an agreement to commit the substantive offense actually existed, and that the individual defendant knew of the agreement, had intent to agree, and had intent to commit the substantive offense. Here, the first part, whether a conspiracy to distribute heroin existed, is not contested, and we need only determine whether, viewing the evidence in the light most favorable to the government, there was sufficient proof of each defendant's knowledge and intent.
 
 
 3
 The direct evidence against Luis Alfredo Martinez-Torres (Alfredo), supplied both by the tape of his conversations with Aponte, and Aponte's testimony about the conversation, indicates that when informed that Aponte wished to purchase "packs of one hundred," Alfredo:
 
 
 4
 1. warned that the police were in the area;
 
 
 5
 2. repeatedly advised Aponte to go to a nearby store; and
 
 
 6
 3. warned Aponte that he would "get screwed" if he remained where he was.
 
 
 7
 While this evidence may sufficiently establish that Alfredo knew of, and intended to aid and abet, the scheme to distribute heroin, it sheds no illumination on the essence of Alfredo's conspiracy conviction: his intent to agree to facilitate the distribution. There exists, however, additional circumstantial evidence implicating him. Later that same day, Epifanio, after negotiating a price for the heroin, gave the same direction provided earlier by Alfredo, namely, to go to a store in the area, and that when Aponte went to the store, he indeed received packs of heroin. Alfredo thus not only provided a prospective heroin purchaser with a warning about police in the area and advice on avoiding arrest, that anyone might do as a friend, but also gave instructions that turned out to be correct on where to go to purchase packs of heroin. In addition, Aponte testified, and the tape could be found to confirm, that Epifanio later told him that when Epifanio was not available it was possible to negotiate with Alfredo. While this last could not establish a conspiracy, it corroborates.[1] Alfredo's is a close case, but we think it so sufficiently distinguishable from United States v. DeLutis, ante, that we should accept the jury's verdict.
 
 
 8
 It is not without significance that this was not a hanging jury, but, rather, one that acquitted defendants on a number of counts. Thus Santos Jesus Martinez-Torres (Santos) was convicted on the conspiracy count and acquitted on six others. He, as other defendants, attempts to parse the evidence against him, and place each discrete piece in an innocuous context. Thus, Santos argues that evidence that "he wanted to sell heroin to" the agent on December 9 does not prove intent to agree with others to do so; that evidence of his presence on December 10 at a conversation between Epifanio and the agent about the purchase of heroin does not prove he agreed with Epifanio to sell heroin; that evidence that on December 11 he and his brothers Antonio and Epifanio met with a "go-between" brought by the agent to purchase heroin; that the group of four then entered the Martinez house, and that the "go-between" then left the house with heroin, does not prove Santos was "connected" to the drug; that evidence that on December 27, after a prior drug sale between Epifanio and the agent in which the agent pretended to be $20 short and Epifanio told the agent that the agent could pay the difference "in the next negotiation," Santos asked for and accepted $20 from the agent does not prove Santos had knowledge of the previous drug transaction; that evidence that on December 27 Santos informed the agent that "the hours for the negotiations had changed" because of police presence in the area, by not specifying the nature of the negotiations, does not prove that Santos agreed to participate in drug sales.
 
 
 9
 Such arguments hardly merit consideration. The agreement comprising the conspiracy need not be shown by direct evidence, and a defendant cannot escape conviction by dividing the evidence into separate single transactions, each of which is an insufficient basis for inferring that an agreement exists. See DeLutis, 722 F.2d at 906. Here, the "development and ... collocation of circumstances" was sufficient to permit the jury to infer the existence of a conspiracy and Santos's participation in it. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 
 
 10
 The claims of Esnoel Lopez Pena and Fernando Rupert-Gonzalez, also convicted of conspiracy and acquitted on the other counts, are similarly unpersuasive, and we but summarize the evidence constituting a sufficient basis for inferring that they, also, agreed to participate in the conspiracy. A tape recording made on January 31 indicates the following conversation between Aponte, the informant, and a man identified by the agent as Rupert-Gonzalez:
 
 
 11
 Aponte: Is Fany in?
 
 
 12
 ....
 
 
 13
 Rupert-Gonzalez: He's not here, you know?
 
 
 14
 ....
 
 
 15
 Aponte: Or Santos; whoever's in.
 
 
 16
 Informant: Or Santos; whoever's in. They know us.
 
 
 17
 Rupert-Gonzalez: What did you come to get?
 
 
 18
 Informant: Another pack.
 
 
 19
 Rupert-Gonzalez: Did you bring the money?
 
 
 20
 ....
 
 
 21
 Informant: Yeah, we always bring the money.
 
 
 22
 Rupert-Gonzalez: And, did you leave it with Tito [Burgos]?
 
 
 23
 Rupert-Gonzalez also discussed the price of the heroin, asked the agent and informant where they would wait, and, the agent testified, said he would send someone to speak with them.
 
 
 24
 Aponte testified that on January 17, after arranging the payment for a heroin purchase with Epifanio, he was directed to a store where Lopez Pena was waiting, that Lopez Pena signalled him to stop, and Burgos, who was standing next to Lopez Pena, then delivered bags containing heroin to the agent. Later, on January 31, the agent approached Lopez Pena and the conversation was recorded:
 
 
 25
 Aponte: Would the boys be down there: Fany [Epifanio] and Tonin [Antonio]?
 
 
 26
 Lopez Pena: I believe that Fany is in the house.
 
 
 27
 Aponte: It's to see if we can negotiate another pack. Couldn't you get him while I talk to him there, to leave the money with him now over there?
 
 
 28
 Lopez Pena: But, I can't tell you that I'll be able to get him for you, because I don't know where he is. You know, the one who deals is Fany.
 
 
 29
 Lopez Pena then summoned Burgos and remained present for a conversation between Burgos and the agent about the purchase of one hundred packs of heroin.[2]
 
 
 30
 For four of the transactions for which Epifanio was convicted of distribution, and for two of the transactions for which Perez-Soto and Burgos were convicted of distribution, the three defendants were also convicted of possession with intent to distribute. Epifanio's argument, joined by Perez-Soto and Burgos, that the trial court erred in not ordering the government before trial to elect between the possession with intent to distribute and distribution counts, offenses clearly involving different elements, is so unsubstantiated as to not merit discussion. See Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); United States v. Palafox, 764 F.2d 558, 560-61 (9th Cir.1985) (election between counts of possession with intent to distribute and distribution not required); United States v. Cortes, 606 F.2d 511, 512 (5th Cir.1979) (same); United States v. Woods, 568 F.2d 509 (6th Cir.) (same), cert. denied, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978).[3]
 
 
 31
 An issue that, if presented on appeal, would have merited discussion is whether the trial court properly sentenced defendants for both distribution and possession with intent to distribute with relation to each transaction. Because appellants do not contend in their briefs that the trial court erred in imposing sentences for both counts for each transaction, but rather seek vacation of their sentences to remedy the alleged error in failing to order the government to elect between counts, we need not discuss this issue here.[4] See Grubba v. Bay State Abrasives, 803 F.2d 746, 747 (1st Cir.1986); Fed.R.App.P. 28(a)(4).
 
 
 32
 All defendants join in asserting a host of errors relating to transcripts not admitted in evidence but used by the jury as an aid in listening to the recordings as they were played. The proper procedures to be followed in using transcripts of recordings admitted in evidence are indicated in our prior opinions. See United States v. Carbone, 798 F.2d 21 (1st Cir.1986); United States v. Rengifo, 789 F.2d 975 (1st Cir.1986). In Carbone, as in this case, "there was no testimony by anyone as to how the transcripts were made," prior to their use by the jury. 798 F.2d at 26. Although we held that because of the circumstances of that case it was not an abuse of discretion for the trial judge to allow the jury to use the transcripts, we recommended,
 
 
 33
 that when transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence, i.e., by testimony as to how they were prepared, the sources used, and the qualifications of the person who prepared them.
 
 
 34
 Id. at 26.[5] The purpose of authentication, of course, is to provide "threshold proof that a piece of evidence is sufficiently what its proponent claims for a court to allow its admission in evidence," United States v. Nolan, 818 F.2d 1015, 1017 (1st Cir.1987), or, in the case of a transcript not admitted in evidence, for its use as a jury aid. Here, however, defendants did not, prior to the jurors' use of the transcripts, make specific objections to the accuracy of the words that were transcribed. Rather, defendants objected to the accuracy of the identification of the voices:
 
 
 35
 [DEFENDANTS' COUNSEL]: Your Honor, we have another problem from our point of view of the transcripts, of this transcript and of other transcripts; that is a matter maybe of credibility, maybe of whether of the preparation of the transcripts, I don't really know....
 
 
 36
 ... I was able to see and perceive from ... the reports and also from the Grand Jury statements made by Aponte that there is some discrepancies as to the identifications that are made in the transcript of persons who are making statements and what was said by Aponte either on his statements to the DEA or in his statement to the Grand Jury. I don't know if Your Honor feels that is a matter of credibility; if it is a matter of the weight, it is a matter of cross examination to be taken and then the jury to decide as a matter of credibility.
 
 
 37
 THE COURT: Okay but just in case I want to present that as an objection to the quality and reliability of the transcripts themselves. Your point is in the record.
 
 
 38
 Earlier in the trial, Aponte testified that he himself had made the identifications indicated in the transcripts, based on his own participation as an undercover agent in the conversations being transcribed. We do not think it was an abuse of discretion for the court to determine that the transcript voice identifications were thus sufficiently accurate to be presented to the jury as an aid.
 
 
 39
 Earlier drafts of the government's transcripts contained voice identifications for certain statements different from those in the version presented to the jury. Defendants sought to present those earlier versions to the jury to show the unreliability of the government's transcripts' voice identifications, and now contest the court's ruling that the earlier versions would not be shown to the jury unless introduced by the defendants in evidence. This is different from the situation discussed in Rengifo, where we held that when the content of a recording is contested, "each party should be allowed to introduce its own transcript of the recording provided that it is properly authenticated." 789 F.2d at 983. Here, there was no authentication of the voice identifications in the earlier drafts; the agent specifically testified that the earlier identifications were incorrect. There was no abuse of discretion in not permitting the jury to see the earlier drafts without admitting them in evidence.
 
 
 40
 Defendants also assert that their convictions must be vacated because each of the transcripts used by the jury contained on its last page the following certification:
 
 
 41
 CERTIFIED: That this is a correct transcript of a cassette recorded on [appropriate date].
 
 
 42
 This certification was followed by the signature of the typist.
 
 
 43
 Inclusion of the certification in the copies used by the jury was an error, a particularly needless error, given the ease with which it could have been avoided. Aside from the fact that defendants did not specifically object to the certification being included in the transcript copies, we think the error was harmless for two reasons. First, the court repeatedly instructed the jury that the transcripts were not evidence, but only an aid, and that what the jurors heard on the tape is what controlled. Second, defendants, through cross-examination, elicited testimony that Aponte made corrections to the typed transcripts after the certification by the typist, thus diluting any weight a juror might have placed on the certifications as an indication of the transcripts' accuracy. It was not error for the court to refuse to instruct the jury completely to disregard the transcripts; the earlier limiting instructions were adequate and in accord with the law in this circuit.
 
 
 44
 In addition to reliance on more general points advanced by other defendants, Burgos complains because of the court's refusal to admit the deposition of a psychiatrist, a Dr. Cabrera, appointed by the court to determine his capacity to stand trial. Dr. Cabrera found such capacity, including the ability to understand and to assist counsel, and that defendant was not insane. The doctor went on to express his opinion as to certain believed defects in Burgos' mental capacity, though conceding that they fell short of an inability to distinguish between right and wrong. Burgos was weak willed, and easily led; "dependent," and with a low IQ, of "borderline" intelligence.[6] Burgos would add this all up to "diminished capacity," and inability to form the necessary intent.
 
 
 45
 If the record, from which Burgos quotes liberally, said what he might wish it said, we might have been required to examine our opinions in United States v. White, 766 F.2d 22 (1st Cir.1985), and United States v. Kepreos, 759 F.2d 961 (1st Cir.), cert. denied, 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985), in light of opinions from other circuits that would appear to allow evidence of mental abnormality or diminished capacity on the issue of mens rea. See United States v. Twine, 853 F.2d 676 (9th Cir.1988); United States v. Pohlot, 827 F.2d 889 (3d Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).[7] However, the record as a whole makes apparent that the doctor--to the extent that he was clear, as to which his use of the word "malice" might raise doubts--was not speaking in terms of capacity to realize Burgos was joining the conspiracy, a question that counsel, deliberately or otherwise, did not raise, but in terms of capacity to have planned it.
 
 
 46
 A. .... He is a person who doesn't have the intelligence nor the malice ... let's say to plan.
 
 
 47
 Q. .... [W]ould you as an expert advise the ladies and gentlemen of the jury as to whether you believe Mr. Burgos to be capable of planning a scheme to distribute heroin?
 
 
 48
 A. .... He doesn't have the intelligence nor the malice to do it.
 
 
 49
 This was a much more sophisticated issue than whether defendant could intend to participate in the plan once he learned of it. If we could be persuaded by the reasoning of United States v. Pohlot, ante, to distinguish with respect to diminished capacity and mens rea, it would not be where the asserted diminished capacity was testified to other than on the issue in question. Given the facility of psychiatric opinions, the flood gates would be opened.
 
 
 50
 Finally, all defendants except Burgos and Lopez Pena contest the legality of their sentences because of the district court's failure to comply with Fed.R.Crim.P. 32(c)(3)(D) regarding opinions and statements attributed to Lieutenant Manuel Rodriguez in defendants' presentence reports. As we have done in the past, see United States v. Jimenez-Rivera, 842 F.2d 545, 552 (1st Cir.), cert. denied, 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 917 (1988); United States v. Serino, 835 F.2d 924, 932 (1st Cir.1987), we remand these cases to the district court for clarification of its reliance.
 
 
 51
 The convictions of all appellants are affirmed. Appeal Nos. 87-2005, 2006, 2007, and 2008 are remanded to the sentencing judge for further proceedings.
 
 
 
 *
 Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 We are not assisted by Alfredo, and another defendant, in separate briefs, citing in their favor, in terms of being controlling, United States v. Alvarez, 610 F.2d 1250 (5th Cir.1980). It is peculiarly not controlling, since it was reversed en banc. 625 F.2d 1196 (5th Cir.1980), cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). See, also, ns. 3 and 7, post
 
 
 [2]
 Lopez Pena's arguments that the audio tape recordings prove he could not have given a visual signal to the agent to stop, and that he could not have been standing next to Burgos are entirely unpersuasive
 
 
 [3]
 Neither defendants nor the government cite any of these cases, which are directly on point. Defendants also fail to distinguish, or even cite, any of the many cases holding that a single drug transaction can lead to convictions for both distribution and possession with intent to distribute. See Annotation, When May Offender Found Guilty of Multiple Crimes Under Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 USCS Secs. 841-51) Be Punished For Only One Offense, 80 A.L.R.Fed. 794, Sec. 3[a, b] (1986)
 
 
 [4]
 We note, however, that had this issue been raised on appeal, based on the evidence presented at trial we would not have reached a different result. See United States v. Carcaise, 763 F.2d 1328, 1333-34 (11th Cir.1985)
 
 
 [5]
 We note that the prosecutor in this case, who also appears before us in this appeal, also argued the appeal in Carbone, and should have been well aware of our recommendations on the authentication of transcripts used as a jury aid. When this court makes specific recommendations on evidentiary matters, it ill behooves a prosecutor to flirt with reversal by not following them
 
 
 [6]
 We note the doctor's concession of the generous number of Puerto Ricans that would be comprehended by this classification, and the number of defendants who might, accordingly, assert such a defense
 
 
 [7]
 Neither Burgos nor the government cites Twine or Pohlot, cases that are directly on point on the issue Burgos alleges is present in this case