**UNITED STATES of America,**
**Appellee,**

v.

**Laurier J. DOYON, Defendant,**
**Appellant.**

No. 98–2030.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1999.

Decided Oct. 19, 1999.

Peter E. Rodway, by appointment of the court, for appellant.

F. Mark Terison, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, was on brief, for the United States.

Before TORRUELLA, Chief Judge, HILL,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

Laurier Doyon was tried by a jury of attempting to possess cocaine with intent to distribute, 21 U.S.C. §§ 841, 846, and convicted of the offense. Because he had two prior drug felonies, he was sentenced as a career offender to 262 months in prison and now appeals. One of his claims is that the evidence was insufficient to support the conviction, so we set forth the facts in the light most favorable to the government. *United States v. Munoz,* 36 F.3d 1229, 1234 (1st Cir.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995). The evidence at trial permitted the jury to find that the following had occurred.

In late August or early September 1997, one Eduardo Escobar–Reyes shared an apartment in Portland, Maine, with a drug

* Of the Eleventh Circuit, sitting by designation.

dealer named Johnny and became involved in Johnny's drug operations. They sold powder cocaine which they obtained from a source in New York. In late October 1997, Doyon helped Escobar and Johnny move to a hotel. Shortly thereafter, at another location, Escobar sold three ounces of cocaine to Doyon for approximately $3,300; the drug was "fronted" to Doyon, meaning that he paid an extra amount per ounce but did not have to pay Escobar up front, a practice that is common in deals between drug traffickers.

Thereafter, Escobar left for New York, where he and Johnny purchased five ounces of cocaine; Escobar returned to Portland on November 4, 1997. At some point thereafter, Doyon called Escobar at the hotel and said that he had the money he owed Escobar from the prior deal and wanted to meet him. (Doyon knew about the New York buying trip because he had driven Johnny part of the way there.) Doyon also indicated an interest in a possible further purchase, but Escobar—who was planning to sell his new inventory to another of his customers (one Harry Brady)—told Doyon that he did not have any drugs to supply. Escobar and Doyon agreed to meet later. This call was not recorded, but Escobar testified to it at trial.

On November 6, 1997, Escobar met with Brady to transfer the cocaine, but Brady was in fact an undercover government agent and Escobar was arrested. Escobar then agreed to cooperate and, while giving a statement, received a pager signal from Doyon and returned Doyon's call in the presence of government agents. That call, and a second occurring soon thereafter, were recorded by the agents using a tape recording device. The tapes and transcripts were offered at trial together with agent testimony that the tapes accurately reflected what they had heard Escobar say.

In the first conversation Escobar indicated that Doyon could not buy any more drugs until he paid off his earlier debt, to which Doyon replied: "I have the money Eduardo." Later in the conversation, Escobar stated: "How, how much you, you want?" Doyon replied: "What do you mean? I want four ounces, at least dude. I want ten." Doyon asked to have Johnny call him and concluded that he and Escobar would meet that night.

At 12:30 p.m., about half an hour after the first call, Escobar (acting under the government's supervision) paged Doyon and a second telephone conversation ensued. In the second conversation, Doyon and Escobar agreed to meet at the hotel at around 5 p.m. Escobar asked Doyon whether he had "all the money"; and Doyon replied: "Of course." Doyon agreed that they would meet at 5 p.m. and persisted in asking Escobar to have Johnny page Doyon.

Under police surveillance, Doyon arrived at the hotel shortly before 6 p.m., entered Escobar's room briefly and then (after not finding Escobar) returned to his truck and started to drive away. When police cars turned on their lights and sirens, Doyon raced away, hitting one vehicle and just missing another, and was caught when he stopped about a quarter mile away. Agents retrieved large amounts of cash from Doyon's pocket and wallet, but evidence of the exact amount was not provided at trial.

Prior to trial, Doyon had sought unsuccessfully to suppress the tape recordings. Following the government's presentation of its case, Doyon asked for a directed judgment of acquittal for lack of sufficient evidence. The district court, although regarding the issue as a close one, denied the motion and the case was submitted to the jury. After several hours of deliberation, the jury convicted Doyon of attempting to possess cocaine with intent to distribute.

At sentencing, the district court attributed to Doyon the four ounces of cocaine that the court thought Doyon had attempted to buy and, as related conduct, the three ounces he had purchased in late

October. This would ordinarily have produced an offense level of 18, which the district court adjusted upward for Doyon's possession of a weapon and for endangerment of others caused by Doyon's flight. In addition, based on two prior drug felony convictions in state court, the district court determined that Doyon was a career offender, U.S.S.G. § 4B1.1, and, after declining to depart, imposed the minimum sentence of 262 months.

The law of attempt is reasonably clear in the center but quite fuzzy around the edges; different formulations have been used to cope with a range of problems, such as degree of involvement, impossibility and withdrawal. *See Model Penal Code* § 5.01 cmt. (1985). In this circuit, as in a number of others, the court has taken the Model Penal Code as its guide. *See United States v. Dworken*, 855 F.2d 12, 16–17 (1st Cir.1988). Under the Code definition, set forth in section 5.01 (reprinted as an appendix to this opinion), we have viewed the two key elements of the offense of attempt as (1) an "intent" to commit the substantive offense and (2) a "substantial step towards [its] commission." *See United States v. Rivera–Sola*, 713 F.2d 866, 869 (1st Cir.1983).

In this case, Doyon's "intent" to acquire cocaine is difficult to dispute (and Doyon does not now challenge the inference that he intended to distribute what he got[2]). Doyon had said at the outset that he wanted to acquire four to ten ounces; he had acquired three ounces from the same source on a prior occasion; and his alacrity in pressing to pay off a prior drug debt supported the inference that he had further interest in acquiring more inventory and reasonably soon.

On appeal, Doyon's attack on the evidence rests on the premise that Doyon could not have intended to accept the new delivery at the same time that he paid off his old debt (because Escobar had said earlier that he did not have any drugs) and that the payment of an old debt as a first step in securing a later delivery is not the "substantial step" toward possession required to make out an attempt. The case law, says Doyon, usually involves conduct by defendant that brings him somewhat closer to final commission of the object crime. *E.g., United States v. Fisher*, 3 F.3d 456, 462 n. 18 (1st Cir.1993) (planning deal, accepting sample, arriving at scene of planned deal).

It is a close question whether the evidence taken as a whole would permit the jury to conclude that Doyon expected to buy cocaine at the same time that he paid off his old debt. Based on evidence not presented to the jury, it appears that Doyon may well have expected to make an immediate purchase;[3] but, of course, our concern is solely with what the jury could reasonably have found on the evidence before it. Escobar's statement that he had no drugs occurred before Doyon came to the hotel, yet it might well be a stretch to suppose that the jury could find beyond a reasonable doubt that Doyon expected to make a purchase on November 6.

The point need not be pursued. In considering the motion to acquit, the district judge rejected the notion that the jury could find that Doyon had an intent to make a simultaneous purchase, and in closing arguments both lawyers invited the jury to focus on a different question, namely, whether in context Doyon's effort to pay off his drug debt could be regarded as

---

**2.** The latter inference was reasonably easy for the jury in light of Doyon's earlier "fronted" purchase, suggesting that he intended to resell the drug, coupled with the amount (four to ten ounces) that he proposed to purchase in the second transaction. *E.g., United States v. Paradis*, 802 F.2d 553, 559 (1st Cir.1986) (eight ounces sufficient to infer intent to distribute).

**3.** At the sentencing hearing, there was testimony from an agent that Doyon had made statements to this effect after his arrest. It appears that the government did not offer this testimony at trial, apparently because it was unaware of it but possibly for other reasons.

a substantial step toward a purchase in the near future and might therefore constitute a substantial step toward possession with intent to distribute. We consider the issue in the same light and, while agreeing that this could be regarded as a close case, uphold the refusal to direct a verdict.

█ The evidence already mentioned was ample for the jury to find beyond a reasonable doubt that Doyon intended to make a purchase of cocaine from Escobar or Johnny in the near future and that Doyon's effort to pay his prior drug debt was intended by him to remove an express obstacle to this purchase. The more difficult question is whether Doyon's effort to make the payoff constituted a substantial step "toward" the commission of the possession, *United States v. Figueroa*, 976 F.2d 1446, 1459 (1st Cir.1992), *cert. denied,* 507 U.S. 943, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993), or (as the Code frames the issue) a substantial step "in a course of conduct planned to culminate in [the defendant's] commission of the crime" in question. *Model Penal Code* § 5.01(1)(c).

Both the Code, and instructions we have approved, say that the substantial step must be one "strongly corroborative of the actor's criminal purpose." *Model Penal Code* § 5.01. But "[i]f there is separate evidence of criminal intent independent from that provided by the substantial steps (*e.g.,* a confessed admission of a design to commit a crime), then the substantial steps · need not themselves be unequivocally indicative of criminal intent—they must merely corroborate that intent." *Dworken,* 855 F.2d at 17 n. 3. Doyon's original, express statement of his aim to acquire four to ten ounces after paying off his debt provides this independent evidence of his intent, and his arrival at the hotel with ample cash corroborates that intent.

4. The Model Penal Code's definition does not refer to "preparation," presumably because preparation and a substantial step could be viewed as overlapping concepts. But we have previously approved the common practice of juxtaposing "mere preparation" with a

The difficult question is whether the conduct, here Doyon's travel to the hotel with cash to pay off the prior debt, is substantial in relation to reaching the criminal goal. Decisions often distinguish between a "substantial step" and "mere preparation," but whether this comparison helps or hinders the jury, it simply shifts the locus of ambiguity from one term to another.[4] However, both our case law and the Code's specific examples of conduct that may be found sufficient as a substantial step show that the defendant does not have to get very far along the line toward ultimate commission of the object crime in order to commit the attempt offense.

Contrary to at least some common law cases, the Code names, as examples of acts that may be a substantial step, "lying in wait, searching for or following the contemplated victim of the crime," "reconnoitering" the place where the crime is to be committed, and "possession of materials to be employed" in the crime if specially designed for unlawful use. *Model Penal Code* § 5.01(2). The cases often involve somewhat more robust facts, but the defendant's arrival at the scene ready to commit the crime has been found adequate to constitute a substantial step in a number of cases. *See United States v. Argencourt,* 996 F.2d 1300, 1304 (1st Cir.1993), *cert. denied,* 510 U.S. 1061, 114 S.Ct. 731, 126 L.Ed.2d 694 (1994); *Chapdelaine,* 989 F.2d at 33.

The main purpose of the substantial step requirement is to distinguish between those who express criminal aims without doing much to act on them and others who have proved themselves dangerous by taking a "substantial step" down a path of conduct reasonably calculated to end in the substantive offense. *Model Penal Code* § 5.01 cmt. 6, at 329–31. It is this purpose that informs the judgment whether a spe-

"substantial step," *United States v. Chapdelaine,* 989 F.2d 28, 33 (1st Cir.1993), *cert. denied,* 510 U.S. 1046, 114 S.Ct. 696, 126 L.Ed.2d 663 (1994) (quoting *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980)), and have no reason to revisit the matter here.

cific act or acts, in context and coupled with proof of intent, can be regarded as substantial, and it helps explain the Code's otherwise confusing conflation of intent and conduct in defining what is a substantial step.

Given this guiding purpose, one can imagine a step toward the offense—literally substantial in time and effort—that might still not qualify as an attempt, at least if the intent was very general.[5] But here, Doyon did not merely seek to pay off a drug debt while generally contemplating some future purchase. Doyon had a prior relationship with his "wholesalers," he had made a prior purchase on credit, he was paying off the first debt as a condition of making a second purchase from the same wholesalers, and his plan to acquire more drugs was specific down to the quantity of drugs being sought. Thus, the "fit" was tight enough for the jury to conclude that Doyon's effort to pay off his prior debt was effectively a substantial step toward possessing more drugs.

There is one further concern. Too ready classification of an otherwise lawful act as a substantial step may capture someone who might well have thought better, and abandoned the effort, before the attempt flowered into the substantive crime. The Code attempts to deal with this problem by giving the defendant an affirmative defense where he abandons the attempt by manifesting "a complete and voluntary renunciation of his criminal purpose." *Id.* § 5.01(4); *see also Dworken,* 855 F.2d at 20. This is of no use to Doyon whose attempt was frustrated and not voluntarily abandoned.

■ Doyon's other ground of appeal is his claim that the district court erred in admitting the tape recordings. He argues that there was an inadequate "foundation" for admitting the tapes because the government did not establish that the recording device was in proper working order. Indeed, the government admitted in court that the tape recorder was an old one that had to be operated manually and, at least in this instance, omitted the first few seconds of both of the taped conversations that were introduced in evidence. Doyon argues that this undermined the necessary foundation and also rendered the evidence misleading and subject to exclusion under Fed.R.Evid. 403.

The "foundation" required in order to authenticate real evidence—here the tape recordings—is simply an evidentiary showing of whatever facts are necessary in the circumstances to prove that the item is what the proponent claims it to be. Fed. R.Evid. 901. In the case of recorded conversations, some courts have a recipe for this showing, *e.g., United States v. McMillan,* 508 F.2d 101, 104 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), but this circuit has simply required proof that the tape recording accurately reflects the conversation in question.[6]

It is true, as Doyon argues, that evidence derived from the operation of a machine or instrument normally depends for its validity on the premise that the device was in proper working order, but the nature and stringency of this requirement varies with the circumstances. A scale that produces wildly disparate readings is unlikely to furnish usable evidence of drug weight; but a tape recorder that cuts off introductory remarks may (and so far as we know here did) produce a perfectly

---

5. One can imagine some debate as to whether a trip from New York to San Francisco—certainly substantial in time and expense—could properly be regarded as attempted bank robbery if there were no other plans or preparation beyond a general (albeit clearly expressed) desire to rob an undesignated San Francisco bank by undetermined means at some unspecified point in the future.

6. *United States v. Carbone,* 798 F.2d 21, 24 (1st Cir.1986); *United States v. Rengifo,* 789 F.2d 975, 979 (1st Cir.1986). *See generally* 5 *Weinstein's Federal Evidence* § 901.07[3][a] (McLaughlin ed., 2d ed.1999).

accurate recording of the remainder of the conversation. An accurate tape recording of part of a conversation is not inherently less admissible than the testimony of a witness who heard only part of a conversation and recounts the part that he heard.[7]

■ This brings us to the real issue, which is whether the tapes' probative value was substantially outweighed by their tendency to mislead on account of the missing portions. Fed.R.Evid. 403. Such judgments, as to which the trial judge has considerable latitude, *United States v. Font–Ramirez*, 944 F.2d 42, 47 (1st Cir. 1991), require a certain amount of imagination wherever the exact content of the omitted portion is unknown. But the recorded portion of the conversation may contain straightforward admissions and there may be no reason to suspect that they were qualified by anything said in the omitted portions.

This appears to be just such a case: the key admissions on the tapes were Doyon's expressed desire to purchase four to ten ounces of cocaine, his intent to pay off his old debt as a predicate, and his plan to meet promptly with Escobar at the hotel. These intentions were either confirmed by or at least consistent with other evidence (the trip to the hotel, the possession of money, the attempted flight), and Doyon himself is unable to suggest what else would likely be on the missing portions of the two tapes that might have tempered or contradicted the admissions.

Thus, no basis exists to suppose that the tapes were misleading at all, let alone that the district judge abused his discretion in rejecting the objection. Nor was there any suggestion that the government chose to cut off portions of the conversation or that it was doing anything other than its best to obtain a complete recording. *See generally* 1 *Weinstein's Federal Evidence* § 106.07[2], at 106–26 (McLaughlin ed., 2d ed.1999). Thus, the conviction was proper and, while the sentence was certainly severe, federal sentencing is largely outside the control of federal judges.

*Affirmed.*

## APPENDIX

*Model Penal Code* § 5.01 (1985). Criminal Attempt.

(1) *Definition of Attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

 (a) purposely engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be; or

 (b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or

 (c) purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

(2) *Conduct That May Be Held Substantial Step Under Subsection (1)(c).* Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

---

**7.** *Addison v. United States*, 317 F.2d 808, 815–16 (5th Cir.1963), *cert. denied*, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964). There are a number of cases, including *Carbone* itself, where partly inaudible tapes were admitted. *See Carbone*, 798 F.2d at 25; *United States v. Font–Ramirez*, 944 F.2d 42, 47 (1st Cir.1991), *cert. denied*, 502 U.S. 1065, 112 S.Ct. 954, 117 L.Ed.2d 122 (1992).

(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

(3) *Conduct Designed to Aid Another in Commission of a Crime.* A person who engages in conduct designed to aid another to commit a crime that would establish his complicity under Section 2.06 if the crime were committed by such other person, is guilty of an attempt to commit the crime, although the crime is not committed or attempted by such other person.

(4) *Renunciation of Criminal Purpose.* When the actor's conduct would otherwise constitute an attempt under Subsection (1)(b) or (1)(c) of this Section, it is an affirmative defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose. The establishment of such defense does not, however, affect the liability of an ac-

complice who did not join in such abandonment or prevention.

Within the meaning of this Article, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, that increase the probability of detection or apprehension or that make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim.