UNITED STATES of America, Appellee,

v.

**Muzamal CHAUDHRY, a/k/a Omar Muzamal, Defendant, Appellant.**

No. 87–1607.

United States Court of Appeals,
First Circuit.

Argued April 4, 1988.

Decided July 8, 1988.

William A. Brown, Boston, Mass., by Appointment of the Court, with whom Brown & Prince, Boston, Mass., was on brief for defendant, appellant.

Robert L. Ullmann, Asst. U.S. Atty., New York City, with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for appellee.

Before COFFIN, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Defendant-appellant Muzamal Chaudhry was convicted in federal district court of possessing heroin with intent to distribute and of conspiracy to commit the substan-

tive offense. *See* 21 U.S.C. §§ 841(a)(1), 846. Following imposition of sentence, Chaudhry prosecuted this appeal. His appellate brief purported to raise momentous questions, but the very extravagance of the claims caused our level of dubiety to rise as inexorably as a moon-drawn tide. Having dug to bedrock and laid bare what actually transpired during the trial, we judge appellant's contentions to be not only factually inaccurate, but legally impuissant as well. Accordingly, we affirm the judgment below.

## I. BACKGROUND

We recount the facts of the matter as the jury plausibly could have found them to have occurred. Chaudhry, a Pakistani national, served in happier times as an informant for the federal Drug Enforcement Administration (DEA). In the fall of 1986, he arranged with Aziz Malik, a DEA myrmidon and fellow Pakistani, for an exchange involving $200,000 in cash and four kilograms of heroin. The buyer was to be one Matthew Algozino. Appellant's ostensible role was to act as a "middleman" between Algozino and the apparent seller, Malik. Conversations between Chaudhry and Malik in arranging the deal, however, convinced the DEA investigators that appellant planned to participate in the transaction for personal gain. When Algozino and Chaudhry appeared at the prearranged hotel room on November 22, 1986 with nearly $200,000 in cash at the ready, they were arrested. The instant indictment followed in due course.[1]

At trial, appellant hawked the story that he was merely assisting the undercover operative, Malik, in snaring Algozino and was, therefore, innocent of the charges. The jury was unconvinced. It is no wonder: the government's proof of Chaudhry's guilt was overwhelming. The DEA had recorded many of the incriminating conversations between Chaudhry and Malik. The recordings—mostly in Punjabi and Urdu—belied the tale appellant told at trial. These recordings are the centerpiece of the assignments of error on this appeal. In addition, the DEA had videotaped the denouement.

## II. ISSUES PRESENTED

Before plunging ahead, we pause to make a paradigmatic point. Appellant alleges, directly, a violation of his due process right to a fair trial and a discovery infraction. Yet his argument, of necessity, also implicates the sixth amendment right of confrontation (and, to a lesser extent, questions impinging on his claimed indigency). These constitutional challenges stem primarily from certain factual assertions made in his brief to this court. Our independent perusal of the transcripts of the trial and the rest of the record, however, as we explain below, reveals little or no support for many of these assertions. The bulk of plaintiff's argument is simply unanchored in the record.

To the limited extent that the facts support appellant's claim of reversible error at all, his asseverations reduce to the following: (1) the district court's limitation on use of the recordings during cross-examination of a government witness abraded appellant's constitutional rights; (2) the DEA's "selective recording" of conversations between Malik and Chaudhry similarly violated appellant's constitutional rights; (3) the district judge, heedless of due process concerns, discriminated against defendant due to his indigency because, during the government's presentation of its case, each of the jurors was supplied with earphones possessing individual volume controls, while during the defense's presentation, different (less desirable) conditions obtained; and (4) a discovery guideline was rudely ignored. *See* D.Mass.Loc.R. 42(a). We will turn first to the factual predicate of the claims of constitutional abridgement, in an effort to segregate the wheat (*i.e.,* facts of record) from the chaff (*i.e.,* imaginary "facts" advanced as such by Chaudhry, but which, insofar as we can tell, derive no record-rooted sustenance). We will then consider such constitutional kernels as remain. Lastly, we address the discovery imbroglio.

---

**1.** Algozino was indicted with Chaudhry and pled guilty. Chaudhry stood trial alone.

## III. FACTS OF RECORD

■ Malik was the government's star witness at trial. Appellant claims that, before Malik's cross-examination,

> the tape recording system in the courtroom became inoperable. The defense requested that the proceedings be moved to a courtroom with proper facilities, but the trial judge refused. ... Without the use of the tape, the defense was unable to conduct a meaningful and effective cross-examination.

Appellant's Brief at 6 (citations omitted). Appellant then relates that, later on, he "took the stand in his own defense.... [T]he recording system was still inoperable and because of the Court's refusal to move the proceedings, appellant was compelled to take the stand and prove his innocence without the aid of the tapes." *Id.* at 7. His lament continues with the lachrymose assertion that:

> The courtroom was equipped with an enhanced recording system which eliminated most of the background noise and static [on the recordings], making the tape clearer and easier to understand [during the government's case-in-chief].... Appellant was denied access to the very same equipment which was made readily available to the prosecution.

*Id.* at 5, 8. We measure these factual assertions against the stark reality of the trial transcript.[2]

Malik was called by the government on the second day of trial. 2T(A) at 10. It was not until the fourth day that defense counsel began cross-examination. 4T(A) at 7. That examination lasted for the rest of that day's session. *Id.* at 7–123. The fifth day of trial began with a colloquy between the judge and the attorneys which provides the *only* factual basis for appellant's first two claims. Apparently, a power failure did occur on day five, making it impossible to use the same tape player which had been used previously. *See* 5T(M) at 3–4; *see also* 5T(A) at 3 (power outage continues during afternoon session). The record,

however, reflects no request by the defendant to adjourn the trial or to have the proceedings moved to another courtroom.

What is more, despite appellant's overblown allegations to the contrary, it is quite clear that defense counsel played significant portions of the recorded conversations during Malik's cross-examination. *See, e.g.,* 5T(M) at 23–43. To be sure, this was done by using a tape recorder different from the one used earlier by the prosecution. But the record is barren of any contemporaneous claim that the equipment was inadequate or the cross-examiner unduly handicapped by the loss of power or the change in machines. It is hornbook law in this circuit that claims not made in the district court cannot be raised for the first time on appeal. *See, e.g., Clauson v. Smith,* 823 F.2d 660, 665–66 (1st Cir.1987); *Nogueira v. United States,* 683 F.2d 576, 578 (1st Cir.1982). This is particularly so, "as the greenest of counsel should know," where such claims are fact-dependent. *United States v. Kobrosky,* 711 F.2d 449, 457 (1st Cir.1983). Appellant's flagship assertion—that the defense was unable to mount an effective cross-examination because it could not properly utilize the tapes —must sink, then, for two reasons: not only is it flatly contradicted by the record, but it is also procedurally defaulted.

■ Chaudhry's related contention—that the judge and the loss of power combined to shortcircuit his defense by inhibiting use of the tapes during his testimony—is equally unfounded. The power failure occurred on Friday, May 8, 1987 (the fifth trial day). There is nothing in the record which would support an inference that the outage survived the intervening weekend. Defendant did not take the stand until May 14. There is no indication that the courtroom was without electricity on that day or that playback of the tapes was somehow mechanically hindered. Furthermore, the transcript reveals no hint, clue, trace, or intimation that defense counsel sought to employ the tapes during the course of Chaudhry's

---

2. We designate transcript references by volume number, the initial "T", the designation "(M)" or "(A)" to differentiate morning from afternoon sessions, and the page number. Under the system used by the court reporters, volume numbers correspond to trial days.

direct examination. To the exact contrary, the lawyer conducted his examination in chief solely from the available English-language transcripts of the conversations. There is nothing to suggest that counsel's examination of his client without recourse to the tapes was the result of either a power failure or a ruling by the trial court. *See* 7T(M) at 36 (at sidebar during appellant's direct, counsel acknowledges his "intention is to have [Chaudhry] go through the transcripts and point out ... the errors"). Eschewal of the recordings was apparently a tactical choice. The claimed disallowance never occurred.[3]

◼ Appellant's third assertion relates to the tapeplaying apparatus. The battery-operated playback equipment used by the defense while cross-examining Malik differed from that used by the prosecution during direct. The chief variant seems to have been that the system defendant used did not have individual earphones with separate volume controls for each juror. Yet defendant's claim that the playback device used by the prosecution comprised an "enhanced recording system which eliminated most of the background noise and static," Appellant's Brief at 5, is largely without foundation. Again, we turn to the record.

John Beckett, a DEA technician, testified that certain of the tape recordings were of less than optimum quality. They were, therefore, processed so as to increase intelligibility and improve the sound quality. Beckett referred to the resultant products as "enhanced" recordings. There was no suggestion that the content of the conversations was altered or that some pernicious sleight of hand was practiced. Most importantly, the enhancement operated to improve the recordings themselves. Once upgraded in this fashion, the benefit of the enhancement inhered to all users and all listeners, no matter what apparatus was employed for playback purposes. The trial record is bare of anything which suggests that the battery-operated equipment which defense counsel used on the fifth trial day did not faithfully reproduce the enhanced sounds, that the jurors could not hear them, or that any contemporaneous objection—say, a motion to continue the case until power was restored—was lodged. Allowing the enhanced recordings to be used in the first place was undeniably proper. *See United States v. Carbone*, 798 F.2d 21, 24 (1st Cir.1986). Appellant could have—but did not—ask the court at that point to make funds available to rent more sophisticated battery-operated equipment.[4] From what the record reveals, Chaudhry's protestation that he was denied access to a method of tape playback which gave the government an unfair advantage appears wholly without merit.

In sum, each of these claims falters at the very threshold, for the underlying factual assertions are free-floating, without any discernible basis in the record on appeal. Procedures exist for supplementing and/or correcting files transmitted from the district court to this court, *e.g.*, Fed.R. App.P. 10(d), (e), but defendant has eschewed that route. He offers us instead an appellate brief which portrays a scenario largely alien to the record. Representations in a brief cannot substitute for a record showing. *United States v. Kobrosky*, 711 F.2d at 457; *see also Goldstein v. Kelleher*, 728 F.2d 32, 37 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *United States v. Gazda*, 499 F.2d 161, 164 (3d Cir.1974). Rodomontade alone proves nothing. To the extent the constitutional arguments stem from such assertions, we cannot—and will not—consider them. *See Ramsey v. United Mine Workers*, 401 U.S. 302, 312, 91 S.Ct. 658, 664, 28 L.Ed.2d 64 (1971); *United States v. Kobrosky*, 711 F.2d at 457.

---

**3.** Some days earlier, the district court did restrict defense counsel's playback of certain tapes during Malik's cross-examination. *See* 5T(M) at 4. Seen in context, that ruling was entirely appropriate. *See infra* Part IV(A).

**4.** If Chaudhry had a late-blooming need for special playback equipment, the means were at hand to assure its availability. The Criminal Justice Act, 18 U.S.C. § 3006A, provides funds to ensure an adequate defense. Chaudhry applied for, received, and used such funds to hire a private investigator to prepare his case. He could have—but did not—make an application for funds to obtain special playback equipment.

## IV. REMAINING CONSTITUTIONAL ISSUES

Notwithstanding that most of Chaudhry's constitutional initiatives wither and die for want of record-rooted irrigation, three allegations have enough of a factual dewfall to require further comment. We address each of them briefly.

A. *Restricted Cross-Examination.* Appellant, during cross-questioning of Malik, was limited by the court in certain respects in his use of recorded conversations between the two. After close per-scrutation of the record, we believe that the court acted within acceptable parameters.

■■■ The right to cross-examine is a fundamental guarantee of the Constitution. *See Davis v. Alaska,* 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *United States v. Rivera Rodriguez,* 808 F.2d 886, 891 (1st Cir.1986). It is, however, not an absolute. A court may place reasonable limitations on the scope and manner of cross-examination. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *United States v. Pitocchelli,* 830 F.2d 401, 404 (1st Cir.1987). In this case, Malik was grilled for nearly two full days on a wide array of issues. Chaudhry has pointed to no relevant topic which he was precluded from probing. Without question, appellant was afforded—and exercised—an ample *"opportunity* for effective cross-examination." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original); *see also United States v. Kaplan,* 832 F.2d 676, 683–84 (1st Cir.1987) (same), *cert. denied,* — U.S. —, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988).

With specific reference to the tapes, it must be remembered that these were mostly in Punjabi and Urdu, and thus (without the aid of an interpreter), incomprehensible to a typical American jury. Despite this drawback, the district court granted appellant considerable latitude in the use of the recordings. Chaudhry's professed reasons for wanting to play them, the record makes manifest, were (1) to highlight avowed discrepancies among certain of the recordings, and (2) to emphasize certain portions of the discourse which appellant thought to be exculpatory. The court invited Chaudhry to submit his own translations of disputed conversations and to compare them with the government's version for the jury's benefit. 5T(M) at 4. Appellant declined the invitation and never supplied any "corrected" transcripts. Furthermore, though the judge told counsel that he would not permit him to play "all the tapes in that foreign language to question interpretations by the person who has already testified," *id.,* he nevertheless allowed more than an hour of this sort of cross-examination.

The Constitution requires, of course, that if defense counsel persists, the jury be given sufficient information on a relevant topic to make a "discriminating appraisal" of the situation and of the witness's motives. *Gordon v. United States,* 344 U.S. 414, 417, 73 S.Ct. 369, 372, 97 L.Ed. 447 (1953); *accord United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986). In this instance, the requirement was treated with due respect. We know of no case which holds that, as a matter of constitutional prerogative, a defendant has the right to play foreign language tapes endlessly to an uncomprehending jury. We decline, in these circumstances, to engraft such a rule onto the sixth amendment.

It would serve no useful purpose to belabor the point. The limitations placed on cross-examination appear altogether appropriate—especially given the fact that the tapes were predominantly in tongues which no one on the jury understood. These limitations caused no discernible prejudice to appellant, and were thus within the court's discretion. *See Twomey,* 806 F.2d at 1140 (to establish abuse of discretion in crimping cross-examination, "defendant must show that the restrictions imposed were clearly prejudicial"). In sum, the court-erected barriers to appellant's use of the recorded dialogue, small to begin with, neither trammelled the confrontation clause, nor "fatal-

ly infected the trial ... necessarily prevent[ing] a fair trial." *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

For these reasons, we descry no constitutional impropriety in respect to the cross-questioning. *See Twomey*, 806 F.2d at 1139–40 (confrontation clause); *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir.1981) (due process clause), *cert. denied*, 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982).

■ **B.** *Selective Recording.* DEA agents recorded some—but fewer than all—of the telephone calls between Malik and appellant. The lawmen also memorialized appellant's conversations which took place (1) in a bar before the scheduled exchange of drugs for money, and (2) in the hotel room when the deal went down. Many other telephone parleys between Chaudhry and Malik admittedly occurred, but were not recorded. Similarly, other meetings involving Chaudhry were not captured on tape. Based strictly on these considerations, defendant charges the prosecution with "selective recording" and brands this conduct as constitutionally repugnant. The proposition, we note, is broached baldly; no supporting caselaw is cited and no coherent theory is offered to explain why the practice offends the Constitution. Instead, defendant relies on the bare, conclusory, and entirely self-serving assertion that such "selective recording [constituted] a violation of his right to due process, confrontation and a fair trial." Appellant's Brief at 5. We find no constitutional infraction.

First, the facts. In November 1986, Robert Allen, a DEA agent, became convinced that appellant, while professing cooperation, was attempting to do an under-the-table drug deal. Allen instructed Malik to record conversations with appellant whenever possible. Malik testified that he was successful in recording some conversations, but that many went by the boards. Often, Malik said, Chaudhry would call him at work or during the wee hours, catching him unprepared or otherwise unable to record.

On this record, it is surpassingly difficult to suggest that the recording was con-

sciously "selective" at all; rather, it seems to have been fortuitous. We cannot transmogrify such fortuity into a constitutionally offensive ogre. The government—so long as it plays fair and by the rules—is entitled to investigate suspected criminality as it sees fit. The budgeting and allocation of scarce investigatory resources, the deployment of personnel, and the calculus of practicality in a given instance are all within the investigatory domain. We see no basis for the imposition, by judicial fiat as it were, of an "all-or-nothing" rule, requiring officers to record *all* conversations (heedless of risk, opportunity, or likely fruitfulness) or none, with no middle ground.

Perhaps there may be a case where selective recording presents a reviewing court with constitutional concerns. We need not speculate on this score, however, for this is surely not such a case. Chaudhry does not contend that the DEA engaged in the so-called selective recording in bad faith, and the record furnishes no basis for any such inference. *Cf. United States v. Quiovers*, 539 F.2d 744, 746 (D.C.Cir.1976) (per curiam) (where prosecution's failure to retain tape recording was not in bad faith, no reason to dismiss indictment). The significance (if any) of the failure to record all of the Chaudhry/Malik conversations was fully explored before, and argued to, the jury. The district court allowed defense counsel substantial latitude in questioning Malik anent unrecorded conversations and the reasons those conversations went unpreserved. Appellant's other attempts to utilize this "selective recording" to his advantage during trial were given like leeway. The jury heard argument, for example, concerning the supposed import of missing conversations and the failure to record them. That was the proper venue for Chaudhry's challenge to the completeness of the picture. *See United States v. Myers*, 692 F.2d 823, 848 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). We find no constitutional infirmity.

■ **C.** *Indigency.* Appellant's next contention—that the prosecution used su-

perior technology to gain an unfair advantage over the defendant, thereby discriminating against him on account of his indigency—is also meritless. To be certain, the Constitution guarantees an indigent defendant the fundamental tools of an adequate defense. *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971). Yet before we reach questions like the constitutional necessity of playback units equipped with individual earphones and volume controls, there would have to be some antecedent showing that such equipment would conceivably have benefitted the defendant at trial. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). No such showing has been made in this case.

As previously limned, *see supra* Part III, the tape recorder used by the defense was satisfactory to fulfill the legitimate purposes of playback. If any of the witnesses or jurors had trouble hearing tapes played in that mode, the record fails to disclose it. In short, there is nothing to suggest that the device now coveted by Chaudhry was essential to the presentation of an adequate defense, or that he was unfairly disadvantaged by its absence.

Before moving on, we are constrained to remark another point: the record is totally barren of any indication that defendant's claimed indigency had anything to do with what playback equipment was used. That is to say, even if special playback equipment were a basic tool of an adequate defense, it was not Chaudhry's indigency which prevented him from utilizing such equipment. As we have already explained, *see supra* at 855 & note 4, the only reason

the government used equipment with earphones and defendant did not was the power failure in the courtroom.

The indigency argument, simply put, is both legally and factually impoverished.

## V. DISCOVERY IMBROGLIO

■ Appellant's plaint that the prosecution trammelled applicable rules in its belated divulgement of tapes and transcripts need not preoccupy us for long. To be sure, D.Mass.Loc.R. 42(a) [5]—which is part and parcel of the district's "automatic discovery" scheme in criminal cases, *see generally United States v. Hastings*, 847 F.2d 920, 921–922 (1st Cir.1988)—governs disclosure of the existence of the recordings and their timely production. *See also* Fed.R. Crim.P. 12(d)(2) (discussing defendant's right to request prosecution to serve notice of intention to use evidence in case in chief); Fed.R.Crim.P. 16(a)(1)(C) (discussing defendant's right to request production, *inter alia*, of "tangible objects"). We agree with the district court that the prosecution substantially complied with its discovery obligations in this case. We examine the circumstances.

One day after Chaudhry's arraignment, the government notified him of the existence of the recordings. Although defendant was not provided with copies of the recordings within the stipulated 14 day period, *see supra* note 5, he had received all of them by February 2, 1987 (some three weeks later). Shortly thereafter, the district court held a hearing on the point. It declined to dismiss the indictment because of the relatively brief delay.[6]

This decision, we think, was entirely supportable. What counts most, in our opin-

---

**5.** The rule provides for "routine and automatic" disclosure in criminal cases, "as soon as counsels' trial engagements permit and in all events within fourteen (14) days after arraignment," of designated material and information, including, *inter alia:*

(1) All relevant written or recorded statements or confessions made by the defendant, or copies thereof....

* * * * * *

(4) All books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which the Government intends

to use at the trial of the case, except reports, memoranda and other internal government documents made by the government agents in connection with the investigation or prosecution of the case....

* * * * * *

(6) ... any wire or oral communications [that] have been intercepted. D.Mass.Loc.R. 42(a).

**6.** The court likewise refused to order dismissal because of the supposed inaudibility of the tapes.

ion, is that Chaudhry had the tapes a full three months before his trial began and had ample time to prepare objections, identify inculpatory and exculpatory passages, and weave the evidence into the fabric of his defense. *See United States v. Carbone*, 798 F.2d at 24. Moreover, the government gained no discernible advantage from the delay. Because the belated turnover did not deny defendant "the opportunity to use the disclosed material effectively," *United States v. Johnston*, 784 F.2d 416, 425 (1st Cir.1986), the delay furnishes no basis for vacating the conviction. *Accord United States v. Drougas*, 748 F.2d 8, 23 (1st Cir.1984).

Chaudhry also complains about procrastination in the provision of transcripts of the recordings. This complaint, too, is bootless. Most of the transcripts used before the jury were delivered to appellant in due season. In reality, then, his asseveration pinpoints a single transcript which was not given to him until the trial. Yet this was merely a corrected version of a transcript supplied to him earlier. It pertained to a recording made the night of the arrest —a recording which had been provided to the defense three months earlier and which memorialized a conversation almost entirely in English. Appellant could have prepared his own transcript but chose not to do so. Withal, he received the government's amended transcript some four days before Malik's cross-examination began, and roughly ten days before Chaudhry himself testified about the incident. He used the government's transcripts extensively (and effectively) at trial, including the late-emerging one. Moreover, in a situation like this one, the government's disclosure obligation under Local Rule 42(a) did not mature until the revised transcript came into existence. At that point, the government acted. This sufficed, in the absence of any record-backed hint that the prosecution acted in bad faith, that it was fatally unassiduous in preparing the document, or that it squirrelled the new transcript away for a period of time.

Because the government substantially complied with discovery rules, and because appellant was in no way harmed by any minor deviations from par, Chaudhry's claim cannot survive scrutiny.

## VI. CONCLUSION

We need go no further. Like mirages distantly glimpsed in the desert heat, appellant's assignments of error disintegrate when viewed from a nearer perspective. Chaudhry, we think, was fairly tried and justly convicted.

*Affirmed.*