Timothy A. BROWN, Petitioner, Appellant,

v.

Ronald POWELL, Commissioner, New Hampshire Department of Corrections, et al., Respondents, Appellees.

No. 91-1707.

United States Court of Appeals, First Circuit.

Heard Dec. 3, 1991.

Decided July 15, 1992.

W. Kirk Abbott, Jr., Asst. Appellate Defender, Appellate Defender Program, for petitioner, appellant.

Janice K. Rundles, Asst. Atty. Gen., Criminal Justice Bureau, with whom John P. Arnold, Atty. Gen., was on brief, for respondents, appellees.

Before CAMPBELL and TORRUELLA, Circuit Judges, POLLAK,* Senior District Judge.

TORRUELLA, Circuit Judge.

Petitioner Timothy A. Brown was found guilty of first degree murder after a jury trial held in New Hampshire Superior Court, Hillsborough County. Pursuant to New Hampshire's first degree murder statute,[1] he was sentenced to life in prison without parole. The New Hampshire Supreme Court affirmed Brown's conviction and his sentence.[2] He then filed a habeas corpus petition[3] in New Hampshire's federal district court claiming that his constitutional right to confront adverse witnesses was violated. The district court dismissed Brown's petition and he appealed. We affirm.[4]

---

* Of the Eastern District of Pennsylvania, sitting by designation.

1. N.H.Rev.Stat.Ann. § 630:1–a.

2. *State v. Brown*, 132 N.H. 520, 567 A.2d 544 (1989).

3. *See* 28 U.S.C. § 2254.

4. This appeal was originally decided by an unanimous opinion dated March 4, 1992. A petition for rehearing was filed by petitioner Brown. In light of the arguments made therein, we withdraw the original opinion and issue the following majority opinion accompanied by a dissent.

The petition for rehearing is denied.

## I

Sometime before 3:00 a.m. on January 14, 1987, the tenants of an apartment building located at 7 Mason Street, Nashua, New Hampshire, heard scuffling noises coming from an apartment rented to Neil Watson.[5] Theresa Warner, who lived above Watson and had a window facing Mason Street, heard the commotion followed by three stomps.

Later that evening, Ms. Warner went to her window and saw two men carrying something from the apartment building and putting it in the trunk of Neil Watson's car.[6] Before the men drove away, Ms. Warner heard the sound of kicking or pounding coming from the trunk of Watson's car.

At around 7:00 a.m. on January 14, 1987, the owner of the apartment building, Philip Rowe, was awakened by a phone call from one of his tenants, who had spotted blood in the driveway leading to the building. Mr. Rowe went to the building and saw a pool of blood in the parking space for Neil Watson's car and a trail of blood from the porch of the building to Watson's apartment. He entered Watson's apartment and saw three pools of blood. He then called the police.

While the police searched Watson's apartment, petitioner and Victor Warner appeared to be unusually curious about the investigation. At one point, petitioner volunteered that in his opinion Neil Watson had committed suicide. Petitioner also told the police that he and Warner had visited Watson on the previous evening to help Watson clean up his apartment after a burglary which occurred the day before. Petitioner stated that Watson was highly intoxicated and had received three crank phone calls.

Watson's car was found the following day with traces of blood in the trunk and in the front passenger seat. On January 16, following some highly suspicious statements made by petitioner to the press regarding undisclosed police material (i.e., how much blood was found in Watson's car), the police interviewed him again. Petitioner volunteered that in his opinion Watson was dead and that he had been transported in the trunk of his car and either dumped in a river or buried.

On January 24, 1987, petitioner requested another interview with the police because he was disturbed that they had interviewed his girlfriend. During petitioner's interview, he was told that the police suspected that Warner had killed Watson and that petitioner was involved in the killing. After waiving his *Miranda* rights, petitioner told the police that he wanted to give them a statement. Petitioner stated that he and Victor Warner had been drinking and taking valium, and had gone to Neil Watson's apartment. Watson and Warner began to fight after Watson grabbed Warner by the testicles. Petitioner intervened, but after Watson pushed him, petitioner grabbed a small wooden table and struck Watson in the head several times. Although Watson fell on his knees and began to bleed profusely, petitioner stated that he continued hitting Watson until he laid on the ground.

Petitioner and Warner then decided to get rid of Watson's body. They put Watson in the trunk of Watson's car and drove away, admittedly hearing Watson's repeated pounding and yelling coming from the trunk. They drove to the Sagamore Point bridge and threw Watson's body into the river. Petitioner indicated that upon looking down at the river, it was apparent that Watson was alive and treading water.[7] Petitioner's oral account was typed by a police agent. Petitioner then reviewed and signed it.

5. Petitioner, Victor Warner (the accomplice), and Neil Watson (the victim), all lived in the same apartment building.

6. As subsequent events would show, one of the men was her son, Victor Warner.

7. The police officers who interviewed petitioner during his statement found him to be rather animated; at one point, he laughed and stated that he had ruined a good jacket and a pair of jeans by getting Watson's blood on them. He also indicated that the killing did not bother him as much as it should.

Following this statement, both petitioner and Warner were arrested. Petitioner was charged with first degree murder and Warner with hindering apprehension. Warner was showed petitioner's statement and he agreed with it.

On May 21, 1987, Watson's body was recovered from the Merrimack River in Lowell, Massachusetts. An autopsy performed by Massachusetts' chief medical examiner revealed that Watson had suffered eleven lacerations to his head and face, which were consistent with being struck with the barrel and handle of a gun. The chief medical examiner opined that drowning associated with impact injury to the head was the cause of death.[8] Warner was thereupon charged with the crime of accomplice to first degree murder.

Before trial, Warner pled guilty to a reduced charge of manslaughter and was sentenced to 15 to 30 years in state prison, the maximum term for that offense. Warner agreed to testify against petitioner and was guaranteed immunity from any further charges.

At trial, Warner testified that he and petitioner were together on the evening of January 13, 1987 and that petitioner took a pellet pistol and suggested that they go see Neil Watson. As Warner conversed with Watson, petitioner struck Watson in the head with the gun until Watson lay flat on the floor. Warner testified that he never fought with Watson.

Warner admitted on direct examination that his plea of guilty had resulted in the dismissal of first and second degree murder charges and a hindering apprehension charge. On cross-examination, Warner was confronted with evidence that he had a criminal record, that he had stolen the murder weapon—the pellet gun—from his father and that he had given the police a statement following his arrest that differed substantially from his testimony at trial. When defense counsel attempted to elicit from Warner what penalty he had avoided by pleading guilty to a lesser charge of manslaughter, the prosecution objected. The judge sustained the objection.

Claudette St. Amant, petitioner's former girlfriend, testified that the day after Watson disappeared, petitioner told her that he had killed Watson.

Petitioner took the stand to assert that Warner had committed the murder. According to petitioner, on the evening of January 14, Warner and Watson engaged in a shoving match after Watson grabbed Warner's testicles. Then, Watson fell on the floor and Warner repeatedly hammered Watson on the head with the pellet gun. Petitioner helped Warner remove Watson's body from the apartment and to throw him in the river, but petitioner stated that he believed Watson was dead from the blows to his head. Petitioner further testified that the statement he gave to the police on January 24, 1987 was not voluntary. Rather, he lied to the police to protect Warner because he was afraid of him.

## II

■ The confrontation clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The right to cross-examination "is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)); *see also Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 482–83, 102 L.Ed.2d 513 (1988) (the confrontation clause of the Sixth Amendment "includes the right to conduct reasonable cross-examination"). The right to cross-examination, however, is not absolute or unlimited.

On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable

---

**8.** At trial, a forensic pathologist called by petitioner, disagreed with the chief medical examiner's opinion. In the pathologist's opinion, the autopsy findings regarding the level of fluid in the lungs were not sufficient to rule drowning as the cause of death and additional testing should have been performed.

limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). *See also United States v. Malik,* 928 F.2d 17, 19–20 (1st Cir.1991); *United States v. Boylan,* 898 F.2d 230, 234 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *United States v. Rivera–Santiago,* 872 F.2d 1073, 1085 (1st Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *United States v. Lynn,* 856 F.2d 430, 432 (1st Cir.1988); *United States v. Chaudhry,* 850 F.2d 851, 856 (1st Cir.1988); *United States v. Frappier,* 807 F.2d 257, 261 (1st Cir. 1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987); *United States v. Kepreos,* 759 F.2d 961, 965 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985).

■ Petitioner attacks his conviction on the ground that his Sixth Amendment right to confront and cross-examine adverse witnesses was violated when the jury was not allowed to hear the potential penalty that Victor Warner, the accomplice and main witness for the prosecution, had avoided by entering into a plea agreement. Petitioner's counsel attempted to elicit the penalty Warner had avoided during Warner's cross-examination:

Petitioner's Counsel: –And you agreed to and accepted a sentence of 15 to 30 years in state prison?

Warner: –That's correct.

Petitioner's Counsel: –And you think that that's a good deal under the circumstances?

Warner: –Not really. Long time.

Petitioner's Counsel: –You understand— you answered [the prosecutor] on direct examination that you understood what you were doing, that you pled to manslaughter?

Warner: –I understand it all.

Petitioner's Counsel: –Received a 15 to 30 year sentence?

Warner: –Yeah.

Petitioner's Counsel: –That's the maximum sentence the law allows for manslaughter?

Warner: –Yes, sir.

Petitioner's Counsel: –And you are telling us you are willing to do that under all the circumstances here, and why are you willing to do that?

Warner: –Why? I don't want to take it to trial.

Petitioner's Counsel: –You don't want to be convicted of first degree murder; do you?

Warner: –Second either.

Petitioner's Counsel: –And you understand the maximum penalty for first degree murder, and second degree murder?

Warner: –I don't know what second is, but I know what first is.

Petitioner's Counsel: –What's the maximum penalty for first degree murder?

The Prosecutor: –Objection.

The Court: The objection is sustained. Tr. Vol. VII, at 137–38. At the ensuing bench conference, petitioner's counsel argued that the true measure of Warner's bias was effectively concealed from the jury. According to the defense, the fact that Warner avoided a potential sentence of life in prison without parole was a crucial piece of information for the jury to evaluate the bias of Warner's testimony. The court, noting that petitioner was himself on trial for first degree murder, ruled that evidence of the penalty for that offense should be excluded pursuant to New Hampshire's rule of not informing the jury of the defendant's possible punishment.[9]

---

**9.** Petitioner asserts that New Hampshire's rule is inapplicable here for several reasons. First, the prosecution first elicited sentencing information from the accomplice and having thus opened the door it could not thereafter exclude such information. Second, the prosecution gains an unfair advantage by informing the jury what punishment the accomplice actually received while excluding the penalty which the accomplice had avoided. Because the right of confrontation under the Sixth Amendment is paramount, New Hampshire's rule should not be followed.

*See State v. Beede,* 128 N.H. 713, 715, 519 A.2d 260, 262 (1986).

Whether a trial court has abused its discretion in limiting the cross-examination of a witness for bias depends on

> whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witnesses.

*United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982). The Sixth Amendment's confrontation clause mandates a "minimum threshold of inquiry" be afforded a defendant in the cross examination of an adverse witness. *United States v. Jarabek,* 726 F.2d 889, 902 (1st Cir.1984). The issue here is whether the trial court abused its discretion and committed constitutional error when it prevented the jury from hearing the potential penalty Warner avoided by pleading out of a first degree murder charge.

The jury at petitioner's trial was clearly given sufficient information from which it could conclude that Warner—the accomplice—had a substantial motivation to testify against petitioner and lie. The specifics of Warner's plea agreement was an issue extensively examined by both sides. Warner acknowledged that he had avoided a potential conviction for first and second degree murder and hindering apprehension by entering into the plea agreement. The trial court instructed the jury that manslaughter is a lesser-included offense of second degree murder and the jury knew

that the State of New Hampshire had granted Warner immunity from any further crimes arising from his testimony. Accordingly, the jury could have inferred that by pleading guilty to manslaughter and receiving a sentence of 15 to 30 years, Warner had avoided a significantly harsher penalty than if he had been tried and convicted for first or second degree murder and for hindering apprehension.[10] The jury had more than sufficient information to conclude that Warner had a strong incentive to lie in order to receive a lesser sentence.

Additionally, the defense cross-examined Warner on other matters bearing on his credibility; his lengthy criminal record; the fact that he had stolen the murder weapon from his father; the fact that he had given the police a statement that differed substantially from his testimony at trial; and the fact that he had reviewed the prosecution's investigative file before testifying. We have no doubt that the jury in this case was presented with ample evidence "to make a discriminating appraisal of the possible biases and motivations of [Warner]." *Frappier,* 807 F.2d at 261. Where a defendant is afforded an opportunity at trial to explore in a substantial manner the inherent bias in the testimony of an accomplice, such as Warner, and the evidence of petitioner's guilt is overwhelming, we will be hard pressed to find that a constitutional error was committed when the trial court prohibited the jury from learning the penalty that the accomplice avoided by pleading

---

We think petitioner's "fairness" argument is at best, mere speculation. In any event, petitioner's argument cuts both ways. Assuming that the prosecution did indeed gain an edge by telling the jury the punishment the accomplice received, it is reasonable to assume that at the same time the jury would have inferred that the accomplice avoided a much more severe penalty and thus had a great propensity to lie about the facts of the murder. Furthermore, petitioner's argument—that we should disregard New Hampshire's rule—boils down to the novel proposition that once evidence of a plea agreement has been introduced at trial, the confrontation clause prohibits the trial judge from imposing limitations on cross-examination regarding the plea agreement. But "'the Confrontation Clause guarantees an *opportunity* for effec-

tive cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware,* 475 U.S. at 679, 106 S.Ct. at 1435 (citing *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (emphasis in original)).

**10.** In fact, as the district court found, petitioner's trial counsel suggested this much to the jury during closing arguments when he stated:

> Vic Warner told you he was afraid he'd go down on first degree murder charge. That's why he pled. He's not real happy with 15 to 30, but it sure beats the alternative.

Tr. Vol. XI, at 25.

guilty to a lesser charge.[11]

*Affirmed.*

LOUIS H. POLLAK, Senior District Judge (dissenting).

At Timothy Brown's trial on a charge of first-degree murder, the chief prosecution witness was Brown's accomplice, Victor Warner. In exchange for Warner's testimony pinning primary blame on Brown, Warner was permitted to plead guilty to manslaughter and was sentenced to fifteen to thirty years in prison. At Brown's trial, Warner was cross-examined about his guilty plea and sentence, but the trial judge did not permit Brown's attorney to examine Warner about the obligatory sentence for first-degree murder—life imprisonment without parole—all risk of which Warner avoided by testifying against Brown. Brown was convicted of first-degree murder and was duly sentenced to life imprisonment without parole. On appeal, the New Hampshire Supreme Court concluded that the trial court's circumscription of the cross-examination of Warner (a) did not contravene Brown's rights under the Confrontation Clause, and (b) was not an abuse of discretion. On the latter point the New Hampshire Supreme Court said: "Since it is well established that a jury should not consider what penalty a defendant may receive if he were convicted, *State v. Beede,* 128 N.H. 713, 715, 519 A.2d 260, 262 (1986), Warner's testimony on this point could have prejudiced the State." *State v. Brown,* 132 N.H. 520, 567 A.2d 544, 547 (1989).

Reiterating the Confrontation Clause claim rejected by the New Hampshire courts, Brown sought habeas corpus in the District Court for the District of New Hampshire. That court dismissed the petition. This court now affirms that dismissal. Persuaded that Brown's rights under the Confrontation Clause were infringed—and infringed in a manner likely to have impaired Brown's capacity to defend himself effectively at trial—I would reverse so that Brown can be fairly retried.

I

The court's opinion summarizes the strong case against Brown. The summary makes plain that the crucial issue confronting the jury, in deciding whether Brown was guilty of first-degree murder, was the relative culpability of Brown and Warner, both of whom acknowledged being present when Neil Watson was killed: was it Brown or was it Warner who had beaten Watson into insensibility with a gun and then taken the lead in shoving him into the trunk of a car and, finally, dumping him into a river? The principal evidence against Brown was two-fold: (1) an inculpatory statement to the police which Brown repudiated at trial (Brown claimed that, because he feared Warner, he had falsely told the police that he, not Warner, was the chief offender), and (2) Warner's trial testimony. Accordingly, defense counsel's chief task at trial was to show the jury that Warner was *not* worthy of belief. On cross-examination, Warner was shown to have a criminal record—and, indeed, to have stolen from his father the gun with which the victim was beaten. The one thing the defense was foreclosed from presenting to the jury was the single fact that could most tellingly underscore Warner's interest in placing the chief blame on Brown—that by bargaining his way out of a first-degree murder charge Warner warded off a life sentence without parole. The centrality of the matter is made plain by the following excerpts from the defense summation:

The State has to tie a case together that dictates to you, that forces you to come to a conclusion beyond a reasonable doubt that Timmy Brown is a murderer. The State has to prove to you that it does all fit together. This is a forum where truth is to come out. The State has to prove to you what is the truth of this reality.

---

11. Since no constitutional error was committed, we will not reach the issue of whether the error

was harmless beyond a reasonable doubt.

And Victor Warner does not create a credible basis for your determining that Timmy Brown slammed, beat Neil Watson with a gun with no reason. Vic Warner snickered and sneered throughout his testimony. Vic Warner is sitting up in the State Prison now in his cell. I think he referred to it as his home, his house.

Vic Warner is still snickering. Vic Warner is snickering, laughing at you, laughing at the system, and he's asking you to find Timmy Brown guilty of murder when Vic Warner got away with murder, when Vic Warner pled to a lesser charge, pled to the manslaughter charge 15 to 30 years in the State Prison. .... Vic Warner told you he was afraid he'd go down on first degree murder charge. That's why he pled. He's not real happy with 15 to 30, but it sure beats the alternative. Vic Warner should have been concerned he would go on down on a first degree murder charge, because he was guilty of first degree murder.

The only way this whole confusing story, this violent, awful episode makes any sense is that Vic Warner is the man who struck Neil Watson. It just doesn't make sense any other way.

Trial Transcript, vol. XI, pp. 24–5 (June 22, 1988).

In short, the jury learned everything about Warner except what mattered most. Under such circumstances courts must be most scrupulously attentive to the teaching of *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986):

> We think a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

It is the case, as the court reminds us, that *Delaware v. Van Arsdall* also instructs that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limitations on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679, 106 S.Ct. at 1435. In this instance the limitation on cross-examination derived from the interest of the New Hampshire prosecutor in keeping from the jurors information about the sentence which Brown would receive, if convicted of first-degree murder. The prosecutor's interest in the matter is understandable; the operative question is whether it translates into a state interest of such compelling weight as to over-balance the accused's entitlement under the Confrontation Clause. The situation is analogous to that presented in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The Court there reversed a conviction for grand larceny and burglary because the trial court would not permit defense counsel, on cross-examination of a "crucial witness for the prosecution," *id.* at 310, 94 S.Ct. at 1107, to show that the witness, who had picked defendant's picture out of a photo array as a person he had seen in an inculpatory context, was on probation as a juvenile delinquent at the time that he identified the defendant to the police. Chief Justice Burger, speaking for the Court, said:

> We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. *Cf. In re Gault*, 387 U.S. 1, 25 [87 S.Ct. 1428, 1442, 18 L.Ed.2d 527] (1967). Here, however, petitioner sought to introduce evidence of Green's probation for the purpose of suggesting that Green was biased and, therefore, that his testimony was not to be believed in his identification of petitioner or at least very carefully considered in that light. Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting, we conclude that the right of

confrontation is paramount to the State's policy of protecting a juvenile offender. *Id.* at 319, 94 S.Ct. at 1112.

And, again:

The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness.... [T]he State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest ...

*Id.* at 320, 94 S.Ct. at 1112.

In sum, a trial judge does have discretion to impose reasonable limitations on the defense's cross-examination of adverse witnesses, even including witnesses on whose testimony the prosecution chiefly depends. So much was made plain in *Delaware v. Van Arsdall* and *Davis v. Alaska,* and also in Judge Bownes' opinion for this court in *United States v. Tracey,* 675 F.2d 433 (1st Cir.1982), a case on which the court today relies. But Judge Bownes' reference to the trial judge's discretion was carefully guarded, in terms which seem to me to be pointedly applicable here:

Although the trial judge retains the traditional discretion to limit the scope of cross-examination, discretion in the area of bias evidence becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant.

*Id.* at 433.[12]  In my view, Brown was not afforded "the constitutionally required threshold level of inquiry."

## II

If I am correct in regarding the trial court's preclusion of vital cross-examination as constitutional error, it would appear almost self-evident that the error is not one which can be classified as harmless. We may think the likelihood is great that the jury, fully informed, would nonetheless

have reached the same verdict. But that, as the Court has explained, is not the correct inquiry. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall, supra,* 475 U.S. at 684, 106 S.Ct. at 1438.

## III

For the foregoing reasons, I respectfully dissent. I would reverse the judgment of the district court, remanding the case for entry of an order granting the writ of habeas corpus unless, within such reasonable time as the district court would determine, New Hampshire were to undertake to retry Brown.

---

12. In *Tracey,* in rejecting a Confrontation Clause claim, this court concluded that "the trial judge was correct in finding that the probative value of this [excluded] evidence was slight."

675 F.2d at 439. It does not appear that the evidence excluded in the case at bar could be so characterized.